We'll start right away with United States v. Kinney. Good morning, your honors. May it please the court. My name is Avi Springer. I'm here on behalf of the defendant appellant, Deborah Kinney. The restitution order in this case must be modified because the district court improperly double counted a $265,000 insurance payment that the National Credit Union Administration received from its insurer, QMIS. NCUA had a policy with QMIS that covered losses for employee or director dishonesty. Under that policy, NCUA initially submitted a claim for $633,702, which was a loss it felt it could attribute to Ms. Kinney's fraudulent conduct. Well, that's what they could trace going directly to her. That's not to say that that's what they asserted was attributable to her fraudulent conduct. That was all that they could attribute actually going to her. Isn't that right? I believe that- That's the argument your adversary is urging on us. The policy they had was for employee director dishonesty. And NCUA felt that, and I should say that that $633,000 figure was ultimately reduced down to $499,000 because the NCUA received payments from one of the beneficiaries of the misappropriated funds. Right, but they told the district court that they were able to document 1.3 million. Right, and- Tell us why your client wouldn't be responsible for all of that, making the amounts to those two particular victims not double count. Well, for a few reasons. And the government acknowledged that it was going to rely on the insurance claims submitted by NCUA as the loss due to criminal conduct, because they acknowledged there was some of the loss that may have been due to criminal conduct, and some of the loss that may have been due to what the prosecutor called non-fraudulent mismanagement. This was a credit union operated in the basement of someone's home, it wasn't the most professional operation. And NCUA, if you read their victim impact statement, acknowledged that they could only attribute this claimed amount to her fraudulent conduct. Although there were certainly more losses paid out, they weren't sure whether all of those could be attributed to criminal conduct, as opposed to what the government called non-fraudulent mismanagement. Did I misunderstand? Didn't NCUA advise the district court that it believed her dishonesty caused the credit union's insolvency? There was a very conclusory statement that it caused the credit union's insolvency. But what the government said at sentencing was they believed the loss amount fell somewhere between $400,000 and $1 million. And that they were going to rely on the insurance claim for employee director dishonesty as the basis for the restitution amount. So even the government at sentencing was not saying we think the full $1.3 million can be attributed to criminal conduct. And the real problem was there was a real lack of documentation at the credit union. And what Ms. Kinney was doing was stealing from Paul to pay Peter, or however you'd like to put it. She was taking money out of one account. And then when that person realized that the account was short, she would shift money from someone else's account. So there was very fuzzy accounting. And at the end of the day, when NCUA reviewed the records they had, they felt that $499,000 was the amount that they could reliably attribute to her criminal conduct. They said, yes, it's possible that more of the losses were due to that, but that's what we have documentation for. But this district court wasn't bound by NCUA's fact findings. So what was missing, let me just finish and maybe you can help me with this thought. Correct me if I'm misunderstanding the record, but I thought NCUA also said based on affidavits and over to 33 different individuals, that there was this $1.3 million loss. Now why wasn't the district court able to not give full credit to that, he didn't, but say that if you add together the insurance proceeds and the $499,000 were not double counting because of that factual finding? It's possible that the court could have done that if there was some reliable methodology to support that, but there wasn't. The burden was on the government here to prove by a preponderance of the evidence the losses due to the criminal conduct. And I think importantly, what the judge based his decision on was a clearly erroneous factual finding that QMIS for some reason had paid out the $250,000 policy limit, not in response to NCUA's actual claim, but in response to what he called the larger loss analysis. And that's a phrase that popped up, I believe, in the government's memorandum on restitution, but wasn't supported by any of the documentation. And it sort of defies logic why the insurance company would pay out $250,000 not for the claim asserted by its insured, but based on some larger loss analysis that was not covered by the policy. I'm not sure I understood the district court's reasoning that way. To the extent that NCUA told them that they thought the claims were a lot higher, or that the loss from the fraud was a lot higher, there were 33 member accounts that were understated by 1.3 million. Why couldn't the district court conclude that it was going to be impossible to pinpoint the number, but on at least 1.3 million documented as missing, attributing half of it, or a little more than half of it, to your client's fraud was certainly more likely than not. I think that would not meet the requirement that the figure has to be supported by a reliable methodology. Well, the extent of the fraud with respect to the documents they were able to produce and the accounts they were able to document was pretty extensive. And it would be extraordinary for mismanagement alone to be responsible for that kind of a loss. That may or may not be the case, but there was not sufficient evidence in the record for the judge to make that finding. The loss restitution requirement is mandatory. It can't be double counted, but neither is your client entitled to a benefit here, because the way the fraud was conducted made documentation difficult. We have allowed district courts to make reasonable estimates. I understand why you would have a concern if you were being held accountable for 1.3 million. But the court said, two victims paid out or were responsible for this money. And the NCUA is going to be responsible on all the loss, right? Aren't they the insurer for the entire thing? Okay. That compensating them for half of what was the documented loss was a reasonable way of understanding that that probably underestimated the extent to which your client's fraud was responsible for this loss. I still believe that that's not a sound enough methodology to support a finding by preponderance of the evidence that- Okay, all right. Why don't we hear from your adversary, and then give you a chance to rebut. Thank you, Your Honors. Good morning. William Darrow from the USIO up in Vermont, representing the appellee. We understand Kenny's argument on appeal essentially to be that Judge Sessions was bound by the findings of the NCUA as you suggested, Judge Liddy said, and of course, the judge isn't. The judge is required to make a reasonable approximation of fraud caused by the defendant for purposes of restitution. So now tell us what that evidence is that would admit the finding. Okay. First of all, Judge Rager, you're correct that it's uncontested that Kenny drove this credit union into insolvency. That fact is not only present in the NCUA report, but it was also in the pre-sentence report and the factual allegations of which were uncontested. So there's no doubt about that. Counsel says only in part by fraud, in part possibly by mismanagement. Right, and we don't really understand that distinction. She was the manager and sometimes the sole employee of the Border Lodge Credit Union. She's also on the board. And no one has ever suggested that anyone did anything wrong other than her. In fact, the other employee was one of the whistleblowers that brought this whole thing to light. So what happened there is on her. Now I think it's pretty hard to take- But there is a difference between malfeasance and nonfeasance. That was the dichotomy that was set up in the discussions below, right? And poor record keeping and the inability to track amounts could make a credit union vulnerable to malfeasance of other people as well. I mean, and the MVRA applies only to malfeasance, right? Well, the law certainly observes that distinction, Judge Carney. But here the NCUA found, as did the pre-sentence report, that Kinney had been manipulating the records at the credit union in order to conceal her fraud. And I'm not really- So do we need to presume that it all was a result of her fraud? Well, certainly the NCUA paid out 1.3 million because of her fraud. And the credit union, which lost a total of 2.3 million, went under because of her fraud. Or, I mean, the NCUA calls it misappropriation. But I'm not sure that distinction between misappropriation and fraud applies. But going to your other point, I think it would be pretty hard to draw a line between when she's stealing money and manipulating records to conceal that, to draw the line which part of that was mere negligence and which part of that was fraud. Okay. Okay, but in any event, perhaps one way to address this is, could Judge Sessions have ordered the full 1.3 million in restitution? Because that's the amount that the credit union administration said, we paid that out to the 33 members that confirmed through the NCUA's applicable procedures requiring affidavits and supporting documentation. That they had lost that amount. The NCUA had a pretty exacting way of making these determinations. And perhaps the reason why Judge Sessions did that is because, Judge Kearney, as you mentioned, there's this issue of maybe some part of it was not fraudulent, maybe some of it was negligent. Also, at the same time that the NCUA said that the half million figure that they came up with was, they indicated that it was at least that amount that she took. So she said, they said, for example, at A62, we believe the actual amount of funds misappropriated by Deborah Kinney is a lot higher. Because the 33 members share accounts that were understated by 1.3 million. And they also said on their first page that they say at least half a million, if not more. So they seem to, I think, be suggesting to Judge Sessions that the figure is a lot more. But the burden's on the government to show by a preponderance, right, the amount that was lost. Just so. Right? And the district court, we need to understand what his reasoning was in making this award. And I was struck by how it was kind of conclusory and less than step by step was his brief opinion. He doesn't mention that he's making a 50-50 kind of judgment about the total $1.3 million loss, for example. It doesn't seem to really address the double counting issue that your adversary has brought up. Where it looked to me as though one insurer was covering part of the other insurer's loss. That doesn't mean that you couldn't get to 1.3 or that the presumptions that you've suggested aren't correct. But it's a little bit more difficult to follow than has been laid out here. How would you respond? Has the government met its burden? And the court done what it needs to in order to allow us to review it? Thank you, Your Honor. You're right that the district court did not break out loss by loss or member by member how it got to the figure that it got to. But we submit that the court essentially safely underestimated the loss amount in such a manner that he knew he wasn't, that Judge Sessions knew that he wasn't up close to the line. So he comes in at, I think it's $812,000. And essentially just adds the 265. And I think the district court's order does indicate that where the total loss is 2.3 million and the actual reimbursements are 1.3 million, 812,000 is far enough under that. So it really can't be said to exceed it. But that argument also suggests that we really should just ignore the difference between nonfeasance and malfeasance, is that right? I don't think you need to ignore it. But I think the National Credit Union administration said that the 1.3 million was, for the most part, attributable to her misappropriation of funds. And maybe that's also language, for the most part, that the district court was concerned about why it went half a million under the total out of pocket reimbursements. May I ask you, did the defendant herself put forward anything, whether as evidence or even in a proffer to the government, to explain how negligence could have caused a loss of this magnitude? No, Your Honor, and I think that was one of the problems that the district court was struggling with below. The Kinney, through a different counsel, sort of slow rolled or did a restitution issue for about seven months after the sentencing. The district court wanted to put it off because the NCUA report was only received shortly before the actual sentencing. Not early enough for the parties to, and the probation office, to thoroughly vet. The imposition of the jail time, when you say the sentencing, right? Yes. Because it was at that time that Ms. Kinney represented to the district court that she would cooperate fully with the courts in making whatever they deemed to be just restitution complete. Am I right? You are right, and the government was a little put off by that because then from June through December, we tried to get former counsel to pay attention to this and Ms. Kinney to address the restitution issue. And finally, the district court scheduled a hearing, the government's filed its memo. Ms. Kinney did not file a responding memo. At the hearing, she made only very general representations, suggesting that she wanted to drag the process on further, saying, well, maybe they would need an expert witness appointed by the court. Might have to have a contested fact hearing. And at that point, we were ten months after the sentencing at which the jail term was imposed. And I think- No guidelines jail sentence. Precisely. And I think both Judge Sessions and certainly the government was a little impatient. Particularly where you had this pretty detailed NCUA report, which yes, they didn't dot every I as to the difference between malfeasance and negligence. But I think Judge Sessions was pretty comfortable that where $1.3 million had been paid out to members who had lost their funds, that an $812,000 restitution amount was safely below that total amount. That it probably underestimated the- Am I right in understanding the NCUA, the $500,000 figure, the conservative figure, they were saying we need to be able to show that money was paid out and we have the documentation to show that it went directly to Kinney or one of her friends. They just wanted a complete loop in the figure they came up with at $499,000. Good question. Your Honor, we've always been a little unclear of how, why the NCA came to such a small figure. Because on the one hand, they're saying over 2 million in losses and we paid out over 1.3 million. And that's only for the 33 members that responded out of the 1,000 members whose accounts went down when this credit union tanked. I'm not quite sure why they came in with the half million figure. Although I think it's fair to assume that their requirements for coming to that proposed restitution amount were considerably more exacting than the preponderance standard used by the district court. So for example, the Fournier loss, they rejected because there wasn't sufficient supporting account documents establishing it. Where of course, at sentencing, where the hearsay rule does not bar information. If there's sufficient indicio of reliability, as there were here, a district court can base findings on an affidavit. So I think the NCUA was being very cautious and very careful. And Judge Sessions was more inclined to think, listen, she tanked this entire credit union. All these people lost all that money, several million dollars, and the NCUA paid out 1.3 million. And the insolvency was caused in its entirety by Kinney, who was manipulating records and sometimes not creating any records, as in the case of the Chad Burns, which helped conceal this whole thing. That a fair amount is $812,000, and we submit, consistent with the language in the Zagari case, that that underestimates the- And following up on Judge Radji's question, so she knew the records since she'd been running the records. So she would have been in a better position than anyone to come forward with some explanation and documentation of how to deal with the losses and what the losses actually were, is that right? Precisely, it's really her credit union for the bulk of the time. When the part-time employee was brought in a little bit late in the game, Ms. Kinney remains the manager, as she had been for years. Now, of course, it was your burden to show what were the losses caused by the crime. So I don't want to suggest otherwise there, but you're saying you showed there was a fraud. It caused a $1.3 million loss at least. The NCUA said, well, some of it might be attributable to malfeasance or non-feasance. And you're saying there's no evidence as to what that could be. Do I understand your argument correctly? because we're going to hear a rebuttal from Mr. Springer in a moment. Okay, I mean, I think the evidence shows that Ms. Kinney used this credit union as basically her personal bank account or slush fund to do with what she wished. And over the course of several years, she blew through hundreds and hundreds of thousands of dollars. And I think it would be very hard to say, well, this part of her fraud scheme or serial misrepresentation was due to malfeasance. But perhaps these records, which weren't created in a certain instance, might have been something different. I think really, the entirety of that conduct should be on her. Now, I think Judge Sessions was also being cautious and saying, well, I'm not going to award the 1.3 million, which incidentally, neither the probation office nor the government requested, but I am going to award $812,000, because I think that's a smaller figure than probably is warranted here. Okay, thank you very much. Thank you. Frank, are you happy? Judge Reggie, I just wanted to respond to your question about the reasoning that the court based the restitution award from. And if you look at page 95 of the record, what the judge said was that QMIS paid the NCUA $265,000 based on NCUA's full loss analysis. And that was the basis for him, that he said was the reason for him adding the $265 to the $499,000 loss that NCUA had already claimed. So I think it's important to recognize what the reasoning of the court was, and that there was simply no basis in the record for the court to conclude that QMIS had paid out this insurance award based on something other than the claim. It had a claim for $499,000 and it had a limited liability, so of course it only paid out its limited liability, but it paid in full on the policy, right? Right. Now we're talking about the NCUA, which didn't get paid the full 499 from the insurer, and in fact paid out 1.3 million. What evidence is there to suggest that that 1.3 million was attributable to anything other than the fraud? The evidence is NCUA's own statements in its victim impact statement that some of the loss was attributable to fraud. And some- Tell me what exactly they say, because you point out that the statement was kind of conclusory as to some other things. What did they say about this? So they said the liquidating- Where page? So page 59 is where their victim impact statement is. In the last paragraph, they say the liquidating agent for the credit union believes that it's entitled to restitution for at least the $520,000, if not more. Right. If not more sounds very speculative to me, and when they're- We have the document. We have the record. They've got $1.3 million in documented loss. Now, to the extent that any small part of it could be attributable to non-feasance, I understand that. But where is there any evidence to suggest that accounting errors or not keeping the books as clearly as you should accounted for a loss of more than a half a million dollars? Well, I don't think it was Ms. Kinney's obligation to come forward with that evidence. It was the government's obligation to- But a fraud of this size, you're going to cause a loss in the amount that the restitution is. I think the other confounding factor is that the government stated, and if you look at page 43 of the record at sentencing, that they were going to rely on the insurance claim as their basis for the loss figure. And that's the argument that Ms. Kinney was on notice of. She asked for a hearing, actually, to contest the restitution amounts and was denied that opportunity. And I think it would be unfair to her to deny her- The government says, but the district court wasn't obliged to rely on the government. I mean, and it has an obligation under the statute to give full restitution to the victim. So, my question to you is, what is it in the record that did not permit the district court to say that it is more likely than not that $812,329 is appropriately ordered as restitution? I think what it is is the court's own statement of its reasoning, which was based on this erroneous factual conclusion that the insurance payment had been made based on some larger loss figure, and under the statute, that is impermissible double counting. Can you tell me what your client meant when it's sentencing she represented to the district court, that she would cooperate fully with the courts in making whatever they deemed to be just restitution complete? What was that representation? I think she wants to make the victims whole for the losses they suffered as a result of her criminal conduct, but that does not alleviate the government of its burden to prove by a preponderance of evidence what is attributable to the criminal conduct versus- The victims have lost over 1.3 million. Now, to the extent that she's saying, but not all by my fraud. Does her cooperation, her promise of cooperation, not involve more than just saying, well, it's only the 499,000 that they can document came right to me. I don't believe that relieves the government of its burden or eliminates the requirement that the district court adhere to the MVRA in determining what the restitution award is. Thank you very much. Thank you. We're going to take the case under advisement and we'll try to get you a decision.